## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **OLIVERO OCHOA,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cv-2135** |
| | ) | |
| **CHAD KOLITWENZEW,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Interested Party.** | ) | |

## <u>OPINION</u>

**SUE E. MYERSCOUGH, U.S. District Judge:**

Before the Court is Petitioner Olivero Ochoa's Emergency
Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241
("Petition") (Doc. 1).  Petitioner seeks immediate release from civil
immigration detention, arguing his current conditions of
confinement violate his Fifth Amendment rights under the Due
Process clause in light of the COVID-19 pandemic, his heightened
risk of serious illness and death from COVID-19 because of his

underlying health issues, and the Respondent's and the Government's insufficient response.  Petitioner also argues that his prolonged mandatory detention without an individualized bond hearing violates his Due Process rights.

The Court held a hearing last week on Thursday, May 28, 2020, regarding the merits of Petitioner's Petition.  For the reasons stated at the hearing and below, Petitioner's Petition (Doc. 1) is GRANTED.

## I.  BACKGROUND

### A. The COVID-19 Pandemic

Petitioner's request for release is based, in part, on the COVID-19 pandemic, the dangers of which are well-known to the parties and the general public.  While the first known case of COVID-19 in the United States was only reported in late January, the virus has spread exponentially and there are now nearly 1.7 million known cases and over 100,000 known associated deaths in the United States alone.  See Cases of Coronavirus Disease (COVID-19) in the U.S., CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 28, 2020); United States

Coronavirus Cases, Worldometers,

https://www.worldometers.info/coronavirus/country/us/ (last

visited May 28, 2020).  In Illinois, there have been at least 115,000

positive cases and 5,000 deaths from COVID-19.  See Coronavirus

Disease 2019 (COVID-19) in Illinois Test Results, Ill. Dep't of Pub.

Health, https://www.dph.illinois.gov/covid19 (last visited May 28,

2020).  As of May 28, 2020, Kankakee County, where the JCDC is

located, there have been at least 1,137 positive cases and 53

deaths. See Kankakee Cty. Health Dep't., Daily COVID-19 Update

for Kankakee County (May 28, 2020),

https://www.kankakeehealth.org/images/COVID-

19_Daily_update_5.28.pdf (last visited May 28, 2020).

COVID-19 is particularly dangerous due to how easily it

spreads, and the severity of the resulting illness.  The U.S. Center

for Disease Control (CDC) reports that COVID-19 appears to spread

from person-to-person, mainly through respiratory droplets

produced when an infected person coughs, sneezes, or talks.

Coronavirus Disease 2019 Basics (May 24, 2020)

https://www.cdc.gov/coronavirus/2019-

ncov/faq.html#Coronavirus-Disease-2019-Basics (last visited May
28, 2020).  The virus spreads very easily through what is called
"community spread."  Id.  While infected individuals are thought to
be most contagious when they are showing symptoms, the virus
also appears to be spread by asymptomatic individuals.  Id.; see
also Transmission, CDC (May 12, 2020),
https://www.cdc.gov/coronavirus/2019-
ncov/hcp/faq.html#Transmission (last visited May 28, 2020) ("The
onset and duration of viral shedding and the period of
infectiousness for COVID-19 are not yet known.").  "[T]hose who
contract the virus may be asymptomatic for days or even for the
entire duration of the infection but can still transmit the virus to
others, making it more challenging to readily identify infected
individuals and respond with necessary precautions."  Mays v.
Dart, No. 20 C 2134, 2020 WL 1987007, at *2 (N.D. Ill. Apr. 27,
2020).

Symptoms of COVID-19 vary greatly between individuals.
Symptoms generally appear two to fourteen days after exposure.
Symptoms of Coronavirus, CDC (May 13, 2020)

https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 28, 2020).  Some individuals appear to show no symptoms, while other individuals will develop cough, shortness of breath or difficulty breathing, fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, or a new loss of taste or smell.  Id.

The symptoms can also lead to serious illness or death.  Id.  While COVID-19 can cause death or serious illness in anyone, certain medical conditions make an individual at a higher risk.  Relevant here, individuals with asthma are at an increased risk of death or serious illness.  See Groups at a Higher Risk for Severe Illness, CDC (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 28, 2020).

There is currently no cure and no vaccine for COVID-19.  The only way to prevent the virus is to prevent it from spreading.  In addition to frequent handwashing, the CDC recommends "social distancing" or "physical distancing" from others by maintaining a distance of at least 6 feet away from other people, avoiding

gathering in groups, and staying out of crowded places.  Prevent
Getting Sick, CDC (April 24, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
sick/prevention.html (last visited May 28, 2020).  Additionally, the
CDC recommends face masks be worn at all times in settings where
social distancing is not possible.  Id.

Congregate living situations, including jail facilities like JCDC,
exacerbate the risk of infections spreading.  This reality has already
played out at many congregate settings across the county.  See,
e.g., Mays v. Dart, No. 20 C 2134, 2020 WL 1987007, at *25 (N.D.
Ill. Apr. 27, 2020) (addressing a conditions of confinement claim
brought by pre-trial detainees at the Cook County Jail and the
challenges of containing the virus in a jail and ordering further
injunctive relief).  As of May 23, 2020, ICE reports a total of 1,327
detainees that have tested positive for COVID-19 out of 2,620
detainees tested.  ICE Guidance on COVID-19: Confirmed Cases,
ICE, https://www.ice.gov/coronavirus (last accessed May 28,
2020).  In the Pulaski County Detention Center in Ullin, IL, 29 ICE
detainees have tested positive. Id.

**B. Petitioner's Conditions of Confinement During the COVID-19 Pandemic**

Petitioner is being detained by the U.S. Immigration and Customs Enforcement (ICE) at the Jerome Combs Detention Center (JCDC) in Kankakee, Illinois.  In response to the COVID-19 pandemic, Respondent Warden Kolitwenzew affirms that a number of additional precautions have been put in place.  As the Government reports, JCDC has not yet had any detainee or staff member test positive for COVID-19.  Resp., Declaration of Chad Kolitwenzew (Kolitwenzew Dec.), ¶ 9 (Doc. 10-1).  Respondent Warden Kolitwenzew's Declaration outlines the policies in place at JCDC, many of which he states have been in effect since on or before March 9, 2020, and comply with the CDC's recommendations.  These measures include screening detainees and staff who enter the facility.  Kolitwenzew Dec. at ¶ 13(C).  The last new ICE detainee entered JCDC on April 3, 2020.  Kolitwenzew Dec. at ¶ 13(B)(2).  The screening includes taking the detainee's temperature and other vitals and housing all detainees separately from the general population for five to fourteen days.  Kolitwenzew

Dec. at ¶ 13(C).  While Respondent claims no detainee has
developed flu-like symptoms, if one did, he would be isolated in a
single cell.  Kolitwenzew Dec. at ¶ 13(B)(3).  Respondent also states
that "the JCDC staff has tested detainees for the presence of the
COVID-19 virus, and all tests have come back negative."
Kolitwenzew Dec. ¶ 9.

Respondent also states that JCDC has increased the
frequency of sanitation procedures and has provided sanitation
supplies to detainees.  Kolitwenzew Dec. at ¶ 13(D).  JCDC
conducts a disinfection routine three times a day, which includes
door handles, toilets, showers, and tables.  Id.  JCDC staff are also
provided with soap, sanitizing supplies, and masks.  Id.
Respondent also states that JCDC has educated detainees
regarding the best practices they can employ to lower their risk of
exposure to COVID-19.  Id.

Respondent states that JCDC medical personnel wear masks
and visit the ICE detainee housing unit twice a day to check on
detainees for COVID-19 symptoms, including temperature checks of
each detainee twice a day.  Kolitwenzew Dec. at ¶ 13(G).

Respondent also states that correctional staff visit the unit every 25 minutes and look for possible COVID-19 symptoms.  Id.

Respondent reports that while JCDC is a 450-bed facility, as of May 25, 2020, the total detainee population was only 313. Kolitwenzew Dec. ¶ 3.  The ICE detainees are housed separately from other detainees, and there are currently 48 male ICE detainees.  Id.  Respondent states that, since March 19, 2020, when there were 155 male ICE detainees, over 100 male ICE detainees have been released from JCDC and no new ICE detainees have entered since April 3, 2020.  Id.  ICE detainees are housed in two-person or four-person rooms with access to a shared living space.

Respondent reports food trays come into the common area of the ICE housing unit twice per day and detainees line up to receive their food tray.  Kolitwenzew Dec. at ¶ 8.  Respondent reports that JCDC staff wear gloves, a hair net, and face mask and verbally remind the detainees to maintain a distance of six feet from the detainee in front of them.  Id.  Detainees then have a choice of eating at communal tables or in their own cell.  Id.  Detainees are not able to sit next to each other at the tables, as every other seat

has been taped off.  Posters in English and Spanish have also been posted to remind detainees to remain six feet apart from others.  <u>Id.</u> Additionally, no social or attorney visits are permitted, and group gatherings, such as classes and religious events, have been cancelled.  Kolitwenzew Dec. at ¶ 13(A)(4).

On Friday, May 22, 2020, JCDC also provided each ICE detainee with two surgical masks.  <u>Id.</u> at ¶ 13(D)(1)).  The ICE detainees are required to wear the masks at all times except when eating or showering.  <u>Id.</u>  JCDC has also ordered washable masks for every JCDC detainee.  <u>Id.</u>  When these masks arrive, each detainee will be provided with two masks, so that one can be washed during the current laundry cycle of three times per week. <u>Id</u>.

### C. Petitioner's Relevant Medical and Immigration History

Petitioner is a 29-year-old Mexican citizen who entered the United States without inspection when he was a child.  Pet. Ex. C, I-589 Application for Asylum and Withholding of Removal (Doc 3-3). Petitioner's medical records from JCDC report that he has various

underlying medical conditions including: asthma, bipolar disorder, developmental learning difficulties, schizophrenia, and anxiety.  Pet. Ex. D, JCDC Medical Records for Olivero Ochoa (Doc. 3-4).  Past records from 2019 also reported that Petitioner had a history of a head trauma, gastoesophageal reflux disease, and sleep apnea.  Pet. Ex. E, Illinois Division of Mental Health Discharge Records for Olivero Ochoa (Doc. 3-5).  At times, Petitioner has also suffered from obesity and elevated blood pressure, although Petitioner concedes that current records do not indicate that these conditions are relevant.  Reply at 8 (Doc. 12).

Petitioner's mental health issues are of particular concern as well.  A recent report from a mental health professional highlighted that his mental disabilities manifest in "poor insight/judgment," and "blunted/flat affect."  Pet. Ex. D at 3 (Doc. 3-4).  Medical staff notes frequently mention his need to be treated as a child, his requests for toys and crayons, and concerns about his welfare.  See generally, Pet. Ex. P. (Doc. 7).  A psychiatrist who interviewed him in early May expressed concern that "he does not seem to have the necessary understanding of a pandemic and what to do in response

to protect himself." Pet Ex. G. Psychiatric Evaluation of Dr. Shoaib Memon, at 2-4 (Doc. 3-7). Notably, recent medical records show that Petitioner is unable to comprehend and is having trouble complying with some of JCDC's COVID-19 screening measures, including frequent temperature checks and social distancing protocols. JCDC has been placing Petitioner on lockdown due to his failure to comply with COVID-19 protocol. See Pet. Ex. P. at 131 (April 23, 2020 record describing how Petitioner is having trouble complying with JCDC's Covid-19 protocol and is being placed in lockdown as a result); Pet. Ex. P at 135 (May 11, 2020 record describing how Petitioner thinks that nurses are hitting him when they conduct forehead temperature checks).

As the Government highlights, Petitioner has a criminal history including: (1) a 2005 arrest as a juvenile aiding/abetting the possession/sale of a stolen vehicle; (2) a 2008 conviction for domestic battery for which he was sentenced to one year of supervision; (3) a 2012 arrest for residential burglary; (4) a 2014 arrest for possession of cannabis; (5) a 2015 arrest for disorderly conduct and criminal trespass to land; and (6) a 2016 conviction of

retail theft resulting in 20 days imprisonment.  Deportation Officer

Fontanez (Fontanez Decl.) ¶ 11 (Doc. 10-3).

Most recently and most notably, Petitioner pled guilty to

residential burglary on June 24, 2019, and he was sentenced to

four years' imprisonment.  He was arrested for this offense on

August 2016 and spent the majority of his time in custody

hospitalized by the State of Illinois and initially deemed unfit to

stand trial.  Pet. at 8 (Doc. 3).  Petitioner received treatment from

October 6, 2016 to June 13, 2019, and, upon his release, the state

court found him mentally fit to stand trial.  Id.  Petitioner was also

sentenced to a two-year period of mandatory supervision, meaning

he will be supervised by an Illinois parole officer upon his release

from custody.  Id. at 9.

On or about June 28, 2019, Petitioner was taken into custody

by the Department of Homeland Security (DHS).  Fontanez Decl. ¶ 8

(Doc. 10-3).  He was issued a Notice to Appear, which charged him

as inadmissible under INA § 212(a)(6)(A)(i) (8 U.S.C.

§ 1182(a)(6)(A)(i)) for having entered the United States without

inspection and INA § 212(a)(2)(A)(i)(I) (8 U.S.C. § 1227(a)(2)(A)(i)(I))

for having committed a crime of moral turpitude (residential

burglary).  Id. ¶ 9.  Due to the latter charge, Petitioner is subject to

mandatory detention and has not been afforded a bond hearing

during his now eleven months in immigration detention.  Id.; 8

U.S.C. § 1226(c)(1)(C).

Petitioner's immigration proceedings have been continued a

number of times at his request.  Petitioner was first scheduled to

appear before the immigration judge on July 29, 2019, but he

refused to attend his hearing.  Fontanez Decl. ¶ 12 (Doc. 10-3).  At

his hearing on August 5, 2019, he appeared with an immigration

attorney and the case continued for attorney preparation.  Id. ¶ 13.

On September 5, 2019, Petitioner filed an application for asylum,

withholding of removal, and protection under the Convention

Against Torture, and the case was continued for Petitioner to get a

psychological evaluation.  Id. ¶ 14.  On October 2, 2019, his case

was set for a merits hearing on November 19, 2020.  Id. ¶ 15.  At

the November 19, 2020 hearing, however, Petitioner's attorney

requested another continuance to obtain a psychological evaluation.

Id. ¶ 16.

On December 4, 2019, Petitioner's attorney withdrew from the case because Petitioner's family was unwilling to pay for a psychological evaluation.  Fontanez Decl. ¶ 17 (Doc. 10-3).  On December 19, 2019, appearing pro se, the immigration judge held a competency hearing and determined that Petitioner was not competent.  Id. ¶ 18.  The immigration judge issued an order to appoint a "Qualified Representative" to represent Petitioner.  Id.

Shortly after Petitioner's current immigration attorney was appointed, Petitioner appeared at a hearing on January 23, 2020 with his new attorney and the case was continued.  Fontanez Decl. ¶ 19 (Doc. 10-3).  At the next status hearing on February 19, 2020, Petitioner's attorney filed a written motion for certain safeguards, requesting an in-person hearing and waiver of Petitioner's testimony for his final merits hearing, arguing that his mental illness and intellectual disability would render such testimony unreliable.  Pet. at 10 (Doc. 3).  The immigration judge directed Petitioner's attorney to submit an expert report regarding the Petitioner's mental capacity.  Id.; Fontanez Decl. ¶ 20 (Doc. 10-3).

Because ICE only permits such evaluations at a specific location and during approved times and dates, such evaluations generally must be coordinated with ICE officers.  ICE initially granted Petitioner access to a psychiatric expert on March 13, 2020.  However, this evaluation was cancelled due to COVID-19 concerns.  Accordingly, Petitioner requested a continuance in his immigration proceedings.  The psychiatrist was able to complete a remote evaluation on May 1, 2020.  Pet. at 11 (Doc. 3).

Petitioner's final immigration hearing proceeded on May 26, 2020.  At the end of the hearing, the immigration judge took the matter under advisement and indicated he would be issuing a written opinion.  Pet. Ex. Q, Supplemental Declaration of Guadalupe Perez at 2 (Doc. 16-1).  At the hearing, Petitioner was not required to testify due to his mental illness and disabilities.  Petitioner's immigration attorney indicated that, in her experience, such a written decision usually takes several weeks before it is issued.  Id. at 3.  Once it is issued, the parties will have 30 days to appeal.  Id.  During this time, Petitioner will continue to be subject to mandatory detention.

### D. Procedural History

Petitioner filed his Emergency Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("Petition") (Doc. 1 (redacted); Doc. 3 (sealed)), on May 20, 2020, seeking his immediate release from ICE detention.  The Government filed a response to Petitioner's Petition (Doc. 10).  Petitioner filed a reply (Doc. 12) on May 26, 2020 and a supplemental declaration (Doc. 16-1) on May 27, 2020.

A hearing on the merits of the Petition (Doc. 1) was held at 1:00 p.m. on May 28, 2020.  As stated at the hearing, and in the Court's Order (Doc. 17), as amended in the Court's May 29, 2020 Text Order, and as further explained below, the Court GRANTS Petitioner's Petition and ORDERS his release.

## II. DISCUSSION

Petitioner alleges he is entitled to release because, in light of his preexisting medical and mental health conditions and the COVID-19 pandemic, his conditions of confinement violate his substantive due process rights under the Fifth Amendment.  Additionally, Petitioner alleges that he is entitled to release because his detention without an individualized bond hearing has become

unconstitutionally prolonged, also in violation of the Due Process

Clause of the Fifth Amendment.  While these are separate claims,

the Court notes that, in many regards, these claims overlap and

should be considered together when considering the overall

reasonableness of his continued detention pursuant to the due

process clause.

The Government argues that the Petitioner does not have

standing, that his claims cannot be brought in a habeas corpus

action, and that the claims fail on the merits.  However, as further

explained below, the Court disagrees and finds that immediate

release is warranted and within the Court's habeas authority.

## A. Petitioner's Claims Are Properly Raised in a Habeas Corpus Petition.

The Government first argues that Petitioner's claim for release

cannot be heard under the Court's habeas jurisdiction.  A federal

court may grant the writ of habeas corpus if a detainee "is in

custody in violation of the Constitution or laws or treaties of the

United States."  28 U.S.C. § 2241(a), (c)(3); see INS v. St. Cyr, 533

U.S. 289, 305 (2001).  A petition seeking habeas corpus relief is

appropriate under 28 U.S.C. § 2241 when a petitioner is
challenging the fact or duration of his confinement.  Preiser v.
Rodriguez, 411 U.S. 475, 490, 93 S.Ct. 1827 (1973); Waletzki v.
Keohane, 13 F.3d 1079, 1080 (7th Cir. 1994).  Habeas corpus has
been recognized as an appropriate vehicle through which
noncitizens may challenge the fact of their civil immigration
detention on constitutional grounds.  See Zadvydas v. Davis, 533
U.S. 678, 688 (2001); see generally, Jennings v. Rodriguez, 138 S.
Ct. 830 (2018).

The Government argues that Petitioner's conditions of
confinement claim cannot be addressed in a habeas corpus petition
because the proper remedy is not release, but a judicially mandated
change in conditions.  Indeed, in most circumstances, the Seventh
Circuit has found that a claim of unconstitutional conditions of
confinement does not entitle a Petitioner to release.  See, e.g.,
Robinson v. Sherrod, 631 F.3d 839, 840-841 (7th Cir. 2011)
(recognizing the "long-standing view that habeas corpus is not a
permissible route for challenging prison conditions" that do not
bear on the duration of confinement); Glaus v. Anderson, 408 F.3d

382, 387 (7th Cir. 2005) (concluding that because "release from custody is not an option" for a claim that alleges that "medical treatment amounts to cruel and unusual punishment" in violation of the Eighth Amendment, it cannot be addressed in habeas).

However, the Seventh Circuit has also recognized that "the Supreme Court [has] left the door open a crack for prisoners to use habeas corpus to challenge a condition of confinement." Robinson v. Sherrod, 631 F.3d 839, 840 (7th Cir. 2011) (internal quotation marks and citations omitted); see also Aamer v. Obama, 742 F.3d 1023, 1032 (D.C. Cir. 2014) (a prisoner may challenge the conditions of his confinement in a federal habeas corpus petition); Thompson v. Choinski, 525 F.3d 205, 209 (2d Cir. 2008) (same).

This Court, as well as many courts across the country addressing similar claims of civil immigration detainees during the COVID-19 pandemic, have found that such a claim can proceed in a habeas corpus petition. See Favi v. Kolitwenzew, No. 20-CV-2087, 2020 WL 2114566, at *6 (C.D. Ill. May 4, 2020); Ruderman v. Kolitwenzew, No. 20-CV-2082, 2020 WL 2449758, at *8 (C.D. Ill. May 12, 2020). See also, e.g., Hernandez v. Kolitwenzew, Case No.

2:20-cv-2088-SLD, Order, d/e 12 (C.D.Ill. Apr. 23, 2020) ("While a "run-of-the-mill" condition of confinement claim may not touch upon the fact or duration of confinement, here, Petitioner is seeking immediate release based upon the claim that there are essentially no conditions of confinement that are constitutionally sufficient given the facts of the case."); Engelund v. Doll, No. 4:20-CV-00604, 2020 WL 1974389, at *7 (M.D. Pa. Apr. 24, 2020); Coreas v. Bounds, No. CV TDC-20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020); Thakker, et. al, v. Doll, No. 1:20-CV-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020).  But see Toure, et al. v. Hott, et al., No. 20-cv-395, 2020 WL 2092639, (E.D. Va. April 29, 2020); Aguayo v. Martinez, No. 20-cv-825, 2020 WL 2395638 (D. Col. May 12, 2020) (holding that the court lacked jurisdiction over ICE detainee's request for immediate release based on COVID-19).

Here, again, this Court finds that Petitioner's conditions-of-confinement claim bears directly on not just his conditions of confinement, but whether the fact of his confinement is constitutional in light of the conditions caused by the COVID-19 pandemic.  This is especially true here, where Petitioner's mental

health conditions prevent him from following COVID-19 protocols, resulting in heightened safety concerns and, apparently, punishment when he does not comply.  Accordingly, the Court finds that his claim can proceed in a habeas corpus petition.

## B. Petitioner Has Standing to Bring His Claim

The Government also argues that Petitioner does not have Article III standing to bring his claim because he has not alleged a cognizable injury.  "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157-58 (2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  The Government argues that Petitioner cannot establish the first and third requirements.

It is true that Petitioner has not argued that he has already contracted COVID-19.  However, an injury can satisfy Article III's requirements so long as it is "imminent, not conjectural or hypothetical." Susan B. Anthony List, 573 U.S. at 158.  This

requirement is met when "the threatened injury is certainly

impending, or there is a substantial risk that the harm will occur."

Id.  As the Supreme Court has made clear, a petitioner need not

wait until he is actually injured in order to obtain preventive relief.

Helling v. McKinney, 509 U.S. 25, 33 (1993).  "It would be odd to

deny an injunction to inmates who plainly proved an unsafe, life-

threatening condition in their prison on the ground that nothing yet

had happened to them."  Id.  The risk of exposure to COVID-19

constitutes exactly the type of "unsafe, life-threatening condition"

that "need not await a tragic event" in order to be remedied.  Id. at

33-34.

As other courts have found "[t]he imminence of the injury

facing Petitioners is accentuated by the growing number of COVID-

19 cases in detention facilities and the widespread havoc the virus

can wreak once inside these facilities."  Coreas v. Bounds, No. CV

TDC-20-0780, 2020 WL 1663133, at *5 (D. Md. Apr. 3, 2020).  And,

here, unlike the toxin at issue in Helling, any exposure to COVID-

19 would present Petitioner with a substantial risk of serious illness

or death.  See also, Bent v. Barr, No. 19-CV-06123-DMR, 2020 WL

1812850, at *3 (N.D. Cal. Apr. 9, 2020) ("Given the exponential spread of the virus, the ability of COVID-19 to spread through asymptomatic individuals, and the inevitable delays of court proceedings, effective relief for Bent and other detainees may not be possible if they are forced to wait until their particular facility records a confirmed case."); United States v. Kennedy, 2020 WL 1493481, at *5 (E.D. Mich. Mar. 27, 2020) ("[W]aiting for either Defendant to have a confirmed case of COVID-19, or for there to be a major outbreak in Defendant's facility, would render meaningless this request for release."); Thakker, 2020 WL 1671563, at *2 ("Respondents would have us offer no substantial relief to Petitioners until the pandemic erupts in our prisons. We reject this notion.").  Moreover, Petitioner asserts that his mental illness and learning disabilities have subjected him to punishment when he resists COVID-19 protocols in JCDC, which means at least part of the injury he alleges is already occurring.  Accordingly, the Court finds that the injury Petitioner alleges is sufficiently imminent to confer standing.

The Government also argues that Petitioner has a risk of contracting COVID-19 out in the community as well, making his release not likely to reduce his potential exposure to the virus, and making his claim fail the "redressability" prong of standing.  The Court disagrees.  "As long as there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit if successful would redress . . ., the fact that a loss or other harm on which a suit is based is probabilistic rather than certain does not defeat standing."  Wiesmueller v. Kosobucki, 571 F.3d 699, 703 (7th Cir. 2009); Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, 508 U.S. 656, 663-64 (1993) ("[By redressability] we mean that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative…").  Petitioner's risk of contracting COVID-19 is obviously substantially reduced when Petitioner is in control of social distancing and other preventive measures, rather than relying on the voluntary actions of dozens of fellow detainees and detention staff to take preventive measures.  See also, Coreas v. Bounds, No. CV TDC-20-0780, 2020 WL 1663133, at *6 (D. Md.

Apr. 3, 2020) (relying on expert opinions to conclude that it was implausible to claim "someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty").  This is especially true for this Petitioner, where he himself appears unable to follow the COVID-19 protocols at the facility due to his mental illness and will greatly benefit from being in a smaller family setting where his potential exposure can be further limited.  Therefore, the Court finds that Petitioner does have standing to bring his claim.

## C. Petitioner's Mandatory Prolonged Detention Without an Individualized Bond Hearing Violates his Due Process Rights.

Petitioner argues that his prolonged detention of eleven months without an individualized bond hearing violates his Due Process rights under the Fifth Amendment.  Petitioner is being detained pursuant to 8 U.S.C. § 1226(c), which mandates an alien's

detention during their immigration proceedings if they have been convicted of certain crimes.

As discussed above, it is well-established that federal courts have jurisdiction to review the constitutionality of a non-citizen's detention under § 1226(c).  See Jennings v. Rodriguez, 138 S. Ct. 830, 841 (2018); Demore v. Kim, 538 U.S. 510, 517, 123 S. Ct. 1708, 1714 (2003).  It is also "well established" that non-citizens in removal proceedings are entitled to the protections of the Fifth Amendment.  See Kim, 538 U.S. at 523.  In evaluating a due process claim, the Court "is required to evaluate the private interest, the probability of error (and the effect of additional safeguards on the rate of error), and the government's interest in dispensing with those safeguards, with a thumb on the scale in favor of the statute's constitutionality."  Parra v. Perryman, 172 F.3d 954, 958 (7th Cir. 1999) (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, (1976)).

The Supreme Court, in analyzing the post-removal order detention statute, 8 U.S.C. § 1231, has held that indefinite detention of a non-citizen would violate the Fifth Amendment's Due

Process Clause.  Zadvydas v. Davis, 533 U.S. 678, 690 (2001) (holding that after a six-month presumptively reasonable period, a non-citizen's detention under the post-removal statute could only continue if there was a "significant likelihood of removal in the reasonably foreseeable future").  However, in Demore v. Kim, 538 U.S. 510 (2003), the Supreme Court rejected a facial challenge to the constitutionality of § 1226(c), finding that indefinite detention was not authorized under the statute because the detention has a "definite termination point," when the removal proceedings conclude.  Id. at 529.  In Kim, the Supreme Court found that, unlike the statute in Zadvydas, the detention authorized under § 1226(c) was of a much shorter duration because in the majority of cases a removal proceeding takes less than 90 days and, if the removal order is appealed, would still only take an average of four months longer.  Id.

However, Justice Kennedy's concurrence in Kim suggested that a non-citizen detained under § 1226(c) would still be "entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or

unjustified." Id. at 532 (Kennedy, J., concurring).  Moreover, as the
Seventh Circuit recognized in Gonzalez v. O'Connell, 355 F.3d 1010
(7th Cir. 2004), in Kim, "the detainees at issue conceded their
deportability" and "Kim's holding was expressly premised on that
fact." Id. at 1019.  Accordingly, the Seventh Circuit explained that
Kim "left open the question of whether mandatory detention . . . is
consistent with due process when a detainee makes a colorable
claim that he is not in fact deportable." Id. at 1019–20.

Recently, in Jennings v. Rodriguez, 138 S. Ct. 830 (2018), the
Supreme Court again addressed a challenge to § 1226(c) and held
that an implicit "reasonableness" limitation of six-months before
providing a bond hearing could not be plausibly read into the
statute under the canon of constitutional avoidance.  Id. at 847
(noting the differences between the language of §§ 1226(c) and
1231, in which the Supreme Court in Zadvydas did read an implicit
reasonableness limitation).  As Jennings noted, § 1226(c) "does not
on its face limit the length of the detention it authorizes," as it only
ends when immigration proceedings have been concluded and the
non-citizen is either released or removed.  Id. at 846.  Jennings,

however, did not address the constitutional question, remanding that question to the Ninth Circuit.  Id. at 851.

While the Government argues that Petitioner's claim must be denied in light of Jennings and Kim, as suggested by Justice Kennedy's concurrence in Kim, the Court finds that both of these cases have left open individualized challenges to a non-citizen's detention under § 1226(c) when the non-citizen has a good-faith defense to removal.  Since Jennings, district courts in the Seventh Circuit and around the country have granted habeas relief to petitioners detained under § 1226(c) after considering case-specific factors, including the overall length of the detention, the reason for the delay, the likelihood of eventual removal, the likely duration of future detention, and the conditions of detention, and balanced them against the Government's legitimate interest in detention. See, e.g., Parzych v. Prim, No. 19 C 50255, 2020 WL 996559, at *3 (N.D. Ill. Mar. 2, 2020) (granting habeas relief to individual detained for "three years without any obvious termination point of his removal proceedings"); Baez-Sanchez v. Kolitwenzew, 360 F. Supp. 3d 808, 815-16 (C.D. Ill. 2018) (granting habeas relief for individual

detained for over four-years without an individualized bond hearing who had a "good-faith belief that he would not ultimately be removed" due to his pending visa petition); Hernandez v. Decker, No. 18-CV-5026 (ALC), 2018 WL 3579108, at *10 (S.D.N.Y. July 25, 2018) (collecting cases).  See also, Vargas v. Beth, 378 F. Supp. 3d 716, 727 (E.D. Wis. 2019), appeal dismissed, No. 19-1965, 2019 WL 6133750 (7th Cir. July 18, 2019) (denying habeas relief on the merits where petitioner had no defense to his removal, but collecting factors courts have used to evaluate the reasonableness of detention).

Here, the Court concludes that Petitioner's detention has become unreasonably prolonged.  Petitioner's overall detention has been eleven months so far—significantly longer than the 90-day average assumed in Kim or the six-month presumed reasonable period of Zadvydas.  See also Hernandez v. Decker, No. 18-CV-5026 (ALC), 2018 WL 3579108, at *1 (S.D.N.Y. July 25, 2018) (finding nine-month detention unreasonably prolonged); Misquitta v. Warden Pine Prairie ICE Processing Ctr., 353 F. Supp. 3d 518, 527 (W.D. La. 2018) (finding ten-month detention unreasonably

prolonged).  The Government seeks to blame Petitioner for the delay
in adjudicating his case.  However, the delays have not been
attempts by Petitioner to "postpone[e] inevitable deportation," or to
try to "game the system."  Baez-Sanchez v. Kolitwenzew, 360 F.
Supp. 3d 808, 816 (C.D. Ill. 2018).  Instead, it appears the delays
are directly tied to Petitioner's mental illness and learning
disabilities.  While the Government is not to blame for such delays,
the Court finds that delays caused by Petitioner's mental illness
and learning disabilities cannot justify or otherwise make his
prolonged immigration detention reasonable—especially because
there has been no finding that Petitioner needs to be civilly
committed or is otherwise a danger to himself or others.  Moreover,
as noted above, it was the immigration judge who ordered a
psychiatric evaluation done, and now it is the immigration judge
who has taken Petitioner's case under advisement.  These delays
cannot be attributed to Petitioner.  See also Chavez-Alvarez v.
Warden York Cty. Prison, 783 F.3d 469, 475 (3d Cir. 2015) ("[I]t is
possible that a detention may be unreasonable even though the
Government has handled the removal case in a reasonable way.").

The Government has submitted no argument that Petitioner's claims for relief from removal are frivolous.  Accordingly, the Court cannot find that his ultimate removal is likely.  Yet, based on the outcome of the immigration proceeding on May 26, 2020, his continued detention is likely to go on for at least several more weeks and potentially months if appeals are filed.

His detention has not been in any conditions meaningfully different than a penal institution, despite its classification as "civil" detention.  See also, Chavez-Alvarez v. Warden York County Prison, 783 F.3d 469, 478 (3d Cir. 2015) ("As the length of the detention grows, the weight given to this aspect of his detention increases."). These conditions have become significantly more problematic during the COVID-19 pandemic considering both his mental illness and underlying health conditions as detailed further below.

While "[t]he Court recognizes that the Government has a valid interest in requiring detention during removal hearings to ensure that removable aliens appear for their removal hearings, the additional safeguard of a bond hearing to make an individualized determination as to [Petitioner's] flight risk and dangerousness

would not impede this purpose." <u>Baez-Sanchez</u>, 360 F. Supp. 3d at

816 (C.D. Ill. 2018).  Moreover, in light of the totality of the

circumstances—which include Petitioner's conditions of

confinement claim as addressed below and the Court's findings that

Petitioner is not a flight risk and that conditions on his release can

ensure he will not be a danger to the community—the Court finds

that Petitioner's immediate release is warranted.

### D. Petitioner's Conditions of Confinement Violate His Fifth Amendment Due Process Rights.

Petitioner also seeks release based on the conditions of his

confinement, arguing, in light of the COVID-19 pandemic, his

underlying health conditions, including his mental illness and

learning disabilities, and facility's insufficient measures to prevent

the spread of COVID-19, that he is entitled to release.  This Court

has already addressed similar claims and found that the claims

succeeded on the merits.  <u>See</u> <u>Favi v. Kolitwenzew</u>, No. 20-CV-2087,

2020 WL 2114566, at *6 (C.D. Ill. May 4, 2020); <u>Ruderman v.</u>

<u>Kolitwenzew</u>, No. 20-CV-2082, 2020 WL 2449758, at *8 (C.D. Ill.

May 12, 2020).  While the Court recognizes that there are key

differences from those cases here, including the many additional preventive measures by Respondent, the Court finds that this Petitioner's claim succeeds on the merits.

Petitioner, as a civil immigration detainee, brings his claim under the Due Process Clause of the Fifth Amendment. The Seventh Circuit has recently clarified that a conditions of confinement claim based on due process is analyzed under the objective inquiry standard announced in Kingsley v. Hendrickson, 576 U.S. 389 (2015). Hardeman v. Curran, 933 F.3d 816 (7th Cir. 2019). While Hardeman addressed a conditions-of-confinement claim for pretrial detainees under the Fourteenth Amendment, the same standards apply to federal civil immigration detainees bringing claims under the Fifth Amendment. See, e.g., Belbachir v. Cty. of McHenry, 726 F.3d 975, 979 (7th Cir. 2013) (applying same standards to civil immigration detainee as to state pretrial detainee).

To prevail on a conditions of confinement claim, Petitioner must prove: "(1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted

purposefully, knowingly, or recklessly with respect to the
consequences of his actions; and (3) the defendant's actions were
objectively unreasonable—that is, "not rationally related to a
legitimate governmental objective or ... excessive in relation to that
purpose." Hardeman, 933 F.3d at 827 (Sykes, J., concurring)
(quoting Kingsley, 135 S. Ct. at 2473–74). The third requirement is
rooted in the Supreme Court's decision in Bell v. Wolfish, 441 U.S.
520 (1979), where the Supreme Court instructed that, in
determining whether "particular restrictions and conditions
accompanying pretrial detention amount to punishment," courts
"must decide whether the disability is imposed for the purpose of
punishment or whether it is but an incident of some other
legitimate governmental purpose." Id. at 538. Kinglsey clarified
that "[i]n the absence of an expressed intent to punish, a pretrial
detainee can nevertheless prevail by showing that the actions are
not 'rationally related to a legitimate nonpunitive governmental
purpose' or that the actions 'appear excessive in relation to that
purpose.' " Kingsley, 135 S. Ct. at 2473 (quoting Bell, 441 U.S. at
561, 99 S.Ct. 1861).

With regard to the first requirement, the Court finds that the conditions involved are sufficiently serious.  <u>See</u> <u>also</u>, <u>Mays v. Dart</u>, No. 20 C 2134, 2020 WL 1987007, at *23 (N.D. Ill. Apr. 27, 2020) (finding that there is "no question that the plaintiffs' claims involve conditions that are sufficiently serious to invoke the Fourteenth Amendment").  The COVID-19 pandemic has infected nearly 1.7 million people and claimed over 100,000 lives in the United States alone.  The situations at the Cook County Jail and at other jails and detention centers across the country have shown just how rapidly this virus can spread in a jail-like setting.  For individuals like Petitioner, with a heightened risk of serious illness or death from COVID-19, the conditions are objectively serious.  Moreover, Petitioner faces increased punitive measures and stress during the COVID-19 pandemic in light of his mental illness and learning difficulties.

The Government argues that Petitioner's medical condition of asthma is not significantly serious to place him at a heightened risk because there is no indication that he has had any breathing difficulties during his detention at JCDC.  Gov't Resp. at 37 (Doc.

10).  However, as Petitioner notes in his reply, JCDC medical staff often record Petitioner as "joking" about not being able to breathe, and complaining about not being able to breathe "out of his ears." <u>See</u> Pet. Ex. P at 49, 52, 69, 72 (Doc. 7).  Petitioner's attorneys state that given Petitioner's difficulties communicating, this may be a sign of him attempting to indicate a problem with his breathing. Regardless, the Court finds that Petitioner's asthma places him at an increased risk of serious illness or death should he contract COVID-19, even if it is not as heightened a risk as someone with severe asthma.  Moreover, and perhaps more importantly, Petitioner has less ability to protect himself to COVID-19 due to his mental illness and learning disabilities.  He has shown resistance and confusion to the COVID-19 protocols, resulting in his punishment and, no doubt, exacerbation of his mental health issues.  All of these factors combined make the conditions he faces at JCDC during the COVID-19 pandemic objectively serious.

The second requirement of <u>Hardeman</u>, that "the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions" does not appear to truly be in dispute.

The Government and JCDC have not disputed that they are aware of the serious risks related to the COVID-19 pandemic or that they are aware of Petitioner's underlying health conditions.  On the contrary, the record reflects that JCDC medical staff are well-aware of his conditions and concerned for his wellbeing.

The parties' dispute centers around the third requirement—whether the Government's actions are objectively unreasonable. The Government has a legitimate nonpunitive interest in detaining individuals like Petitioner pending the execution of a valid removal order against them.  See Demore v. Kim, 538 U.S. 510, 528 (2003); Zadvydas v. Davis, 533 U.S. 678, 690 (2001).  The Government argues that Petitioner cannot show that there is an objectively unreasonable risk of harm in light of this legitimate nonpunitive interest because JCDC has taken reasonable steps to protect the detainees from COVID-19.  As detailed above and in Warden Kolitwenzew's declaration, JCDC has implemented numerous policies and procedures to prevent the introduction and spread of COVID-19.  The Government places great weight on its claim that it has largely implemented all of the guidance from the CDC.

However, as other courts have found, the CDC's guidelines, while important, are not dispositive standing alone.  <u>Mays</u>, 2020 WL 1987007, at *27; <u>Malam v. Adducci</u>, No. 20-10829, 2020 WL 1899570, at *4 (E.D. Mich. Apr. 17, 2020) (addressing limits of CDC guidance and noting that they only make recommendations for precautionary measures but [do] not assess the resulting risk of COVID-19 infection once those measures have been implemented.").  Detainees still appear to be largely relying on voluntary social distancing measures of others, and it is not clear whether the policies of JCDC are being uniformly executed in practice.  Nonetheless, the Court finds that many steps have been taken to prevent and control any potential spread of the virus.

The Government also importantly points out that there are no known cases of COVID-19 in the facility.  However, many other courts have found that release was still appropriate despite there being no evidence of COVID-19 in the facilities in light the individual petitioner's health conditions and inadequate precautions taken at the facility to prevent potential introduction and spread of COVID-19.  <u>See</u>, <u>e.g.</u>, <u>Fofana v. Albence</u>, No. 20-

10869, 2020 WL 1873307, at *9 (E.D. Mich. Apr. 15, 2020)

(releasing ICE detainee with underlying medical conditions placing

him at high risk); <u>Malam v. Adducci</u>, No. 20-10829, 2020 WL

1899570, at *3 (E.D. Mich. Apr. 17, 2020) (rejecting Respondent's

argument that "that until there is a confirmed case of COVID-19, or

perhaps an outbreak of the illness it causes, in the Calhoun County

Correctional Facility, Petitioner cannot show that COVID-19 poses

an unreasonable risk of infection" as "fly[ing] in the face of public

health experts").  Notably, the only way to determine if the virus is

present in the facility is to do wide-spread testing for the virus,

which Respondent has not alleged has occurred, and may not be

practical given nationwide limited testing capacity.

However, whether JCDC has taken reasonable steps overall to

combat the spread of COVID-19 is not the question the Court is

confronted with here.  Rather, this Court asks whether this

Petitioner's continued confinement during this global pandemic is

justified by the Government's legitimate interest in Petitioner's

detention.  And, like the Court has found in previous cases, when

an individual has a heightened health risk, this can change the

balance.  Despite JCDC's efforts, Petitioner's continued confinement still presents an increased and serious risk of contracting COVID-19.  Staff, obviously, continue to enter and exit JCDC—each time potentially bringing the virus into the JCDC.  And many detainees appear to still be transported for hearings.  Respondent states that JCDC now—nearly three months into the pandemic—has provided masks to all detainees and mandated their use at all times other than eating and showering.  While the Court commends this measure, as well as other preventive measures, the Court finds that Petitioner's mental illness and learning disabilities will likely prevent his compliance with these policies.  This lack of compliance not only may result in his continued punishment for not following protocols, but this lack of compliance reduces the potential effectiveness of these policies as to Petitioner.

While the Court agrees Petitioner has not shown that the Government has any express intent to punish him, the Court finds that, considering the totality of the circumstances, Petitioner's detention appears "excessive in relation to" the Government's "legitimate nonpunitive governmental purpose" for detaining him.

Kingsley, 135 S. Ct. at 2473 (quoting Bell, 441 U.S. at 561, 99 S.Ct.
1861).  This is especially true considering that the Government's
interest in detention is already significantly lessened by Petitioner's
prolonged detention without an individualized bond hearing.
Petitioner's continued detention under these conditions is not
objectively reasonable nor is it logically related to the Government's
interest in ensuring Petitioner's presence at his removal hearing
when there are "a plethora of means other than physical detention
at [the Government's] disposal by which they may monitor civil
detainees and ensure that they are present at removal proceedings,
including remote monitoring and routine check-ins." Thakker, et.
al, v. Doll, No. 1:20-CV-480, 2020 WL 1671563 (M.D. Pa. Mar. 31,
2020); see also Fraihat, 2020 WL 1932570 at *26 ("[A]ttendance at
hearings cannot be secured reliably when the detainee has, is at
risk of having, or is at risk of infecting court staff with a deadly
infectious disease with no known cure. Participation in immigration
proceedings is not possible for those who are sick or dying, and is
impossible for those who are dead."); Malam v. Adducci, No. 20-
10829, 2020 WL 1899570, at *6 (E.D. Mich. Apr. 17, 2020) (noting

that, unlike the other habeas cases, the Government "has additional precautionary measures at [its] disposal: the release of Petitioner," and noting that "ICE has released other detainees due to the risks of COVID-19").

This point is underscored by the Court's findings that Petitioner would not be a flight risk and that conditions of release can be put in place to ensure he is not a danger to the public. Notably, Petitioner has lived here since childhood, has many family ties, and is represented by counsel in his immigration hearings. While Petitioner has a criminal history, it appears largely tied to his mental illness and learning disabilities, which Petitioner has been receiving treatment for and a plan is in place for his continued treatment.  Accordingly, the Court finds that Petitioner's confinement during the COVID-19 pandemic, given his unique health risks, mental illness, and learning disabilities, and given Petitioner's already prolonged detention, violates his due process rights under the Fifth Amendment and he is entitled to immediate release.

### III. CONCLUSION

For the reasons stated above and at the hearing on May 28, 2020, Petitioner's Petition for Writ of Habeas Corpus (Doc. 1) is GRANTED pursuant to 28 U.S.C. § 2241(c)(3).  Petitioner is ORDERED released pursuant to the terms in the Court's Order (Doc. 17), as amended in the Court's May 29, 2020 Text Order.

This Case is CLOSED.  The Clerk is DIRECTED to prepare the Judgment.


ENTER: June 1, 2020


/s/ Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE